We will do the last case of the morning, Mr. Telchi v. Israel Military Industries, Ltd. Mr. O'Connor, we'll be pleased to hear from you. Thank you. Good morning, Your Honors, and may it please the Court, I'm Patrick O'Connor with Harper-Meyer. for the plaintiff and appellant here, Mario Azbun-Telchi. Your Honors, this is a significant case. It will help to establish the contours of federal jurisdiction over the commercial activities of foreign sovereigns acting in the United States. Given the fact that it's a relatively fact-heavy appeal, I wanted to highlight some of the Your Honor, Mr. Azbun was IMI's representative in Bolivia for approximately 20 years. Throughout that time period, Mr. Haim Gehry, who was well known as IMI's regional manager for Latin America, was Mr. Azbun's principal contact. From 1995 through 2008, Mr. Gehry was based in and provided support from Miami, which In 1998, the Bolivian government began an investigation into the sale of IMI products in Bolivia. Despite a variety of legal obligations to participate and appear, IMI refused to participate in those proceedings. They refused to respond to investigative subpoenas and other inquiries by the Bolivian government. The Bolivian government turned to Mr. Azbun to defend IMI, which he did at great personal expense. For us, Your Honors, this is really the heart of the matter. This is where the relationship broke down, and this is really what caused damage to Mr. Azbun, was that whereas previously IMI had provided Mr. Azbun with substantial support, primarily through Mr. Gehry here in Miami, it suddenly withheld that support, and it caused great damage. That withholding of support caused great damage to Mr. Azbun and resulted in By support, you mean reimbursement of expenses. No. In fact, Your Honor, by support, I mean dealing with the government in a post-sale environment. In this particular case, there had been a sale of rifles to the Bolivian government. The government decided that it was going to investigate that sale of rifles for potential corruption, and it placed the burden on IMI to produce certain documents. No, I'm talking about – that's not what I asked. What I asked was when you talked about substantial support previously, what was that substantial support that you say happened previously? Okay. Mr. Gehry was Mr. Azbun's principal contact at IMI. Whenever he needed to communicate with IMI, he did so through Mr. Gehry in Miami. Whenever he needed to speak with someone at IMI, he went in person. He would meet with Mr. Gehry. So from our perspective, all of the communications flowed through Mr. Gehry here in Miami. Now, the district judge made some factual findings. She did, Your Honor. Yes. And I didn't see anything which said, no, Your Honor, we have a dispute on this. We need a hearing. I didn't see any request for a hearing for the judge to assess credibility. So the judge made the factual decisions based on what the parties had presented, right? And so what are we going to do with those factual decisions? In part, Your Honor, we did not separately request a hearing. We felt that the record well represented the facts from our perspective, and we thought that the court could make a decision on that basis. However, something very interesting happened. As you know, the court issued two related orders in this proceeding. One was the order granting renewed motion to dismiss, and then later there was a correction of sorts in an order denying motion for relief. In the order granting . . . That's because she made a mistake. Yeah. That's where she relied on the Florida long-arm statute. Yes. But she later corrected that in the order on the motion for reconsideration. That's correct, Judge Rubino. Interestingly enough, though, the basis of our motion for relief, the principal matter in our motion for relief, was something related to the FSIA mistake, which was that she hadn't considered six pages of our argument and our presentation of facts relating to specific personal jurisdiction. And I'm still confused as to why that happened. In the original order, the order granting renewed motion to dismiss, the court came out and said, plaintiff has made no argument with regard to specific personal jurisdiction. And, of course, we did. We made six pages of argument with regard to specific personal jurisdiction, and we laid out the facts that we believed supported our position. But for whatever reason, it appears that Judge Lenard and the court missed that argument and missed those facts that we introduced on specific personal jurisdiction. And then the issue was compounded because when she then went back and issued the order denying motion for relief, instead of going back and looking at the facts anew under the FSIA, she simply adopted, in block quote, the factual determinations that she had made in the original order granting renewed motion to dismiss, which, again, we believe excluded or ignored all of our argument on specific personal jurisdiction. Let me ask you this. It seems to me the heart of this case is this. The Foreign Sovereign Immunities Act clearly applies here unless you can show that this commercial activity exception applies. Why do you say the commercial activities exception applies in this case when it seems to me the majority of everything surrounding these contracts took place in Bolivia and Israel? A very good question, Judge Urbina. That's this case, isn't it? That's the heart of the case. Sure. The question is whether IMI engaged in commercial activities in the United States and whether our claims are based upon those commercial activities. We firmly believe that they are and that the commercial activities— Based on what? Based on the record evidence. Perhaps I can go through the— The negotiations and the performance occurs in Bolivia, right? That is correct. Where was the contract drawn? The contract, I believe, was drawn in Bolivia. So what happened in the United States that would cause this commercial exception to apply? Right. So you're asking how our claims are based upon— Unless that applies, you lose this case. Right. I'm sorry, Judge Urbina. Are you asking whether— I'm asking, I want you to tell me why the commercial activity exception to the FSIA applies in this case. Okay. First, I can go through the commercial activities that the record evidence demonstrates, which are that IMI— Give me one second. IMI maintained a commercial presence in Miami. We have deposition testimony on that, and we have internal memorandum that demonstrate that they maintained that commercial presence. And what did they do here in Miami specifically with respect to this contract? So with regard to this contract, they provided support to Mr. Osboon in Bolivia. Whenever he had questions relating to the contract, the negotiation of the contract, the implementation of the contract, he turned to Mr. Gary, who was— Who lived in Miami. Who was in Miami, who operated out of Miami, and Miami was chosen by IMI as its base of operations for Latin America. But, yes, the linchpin of this entire case is Mr. Gary and the fact that Mr. Gary provided the support to Mr. Osboon. Does Mr. Gary have an IMI office here, or he's just working out of his home? Well, this is— Mr. Gary has a home office. He also has an office that he states relates to his consultancy. But IMI doesn't rent space here. I do not believe IMI appears on a lease in Miami. That's correct. But if you're talking about whether IMI engages in the type of activities that a company would engage in, had they an office in Miami, they do engage in all of those activities. It seems that there was a factual dispute as to how much Mr. Gary was doing on behalf of IMI in Miami. But it also seems to me that the district court resolved that and said most of the time Mr. Gary used Miami as a base because he traveled, and that when Mr. Telchi? Mr. Osboon, because of the naming convention in Latin America. Okay, Mr. Osboon. When Mr. Osboon went to Miami, he would go for various things, nothing specific to this contract. So the district judge is making all these findings. I don't know what I'm supposed to do with that. It seems to me that if there's a conflict and the district judge has to resolve the facts, they were resolved. Unless you can show that she totally refused to look at your evidence, then you got . . . Is that your argument? Basically, she didn't look at your evidence. That's correct, Judge, and it's a very difficult thing to show, I grant you. But I will say there is that chain of logic from her, for whatever reason, missing our argument on specific personal jurisdiction and all the facts that that contains, creating a list of 17 factual statements, all of which can be traced back to the argument of IMI and the evidence presented by IMI, and then cutting and pasting that factual determination from the erroneous order granting renewed motion to dismiss into the order denying motion for relief. We do believe that our facts have never been properly considered. And if they were, they would have revealed seven separate conflicts in the evidence presented, between the evidence that we present and the evidence they present. And it's our contention that under . . . Like what? There are seven of them. Number one, she determined that IMI never had any office in the United States. No mention was made of the record evidence demonstrating that IMI chose Miami as its base of operations. But you just tell me they didn't have an office here, didn't rent any office here. They may not have had a physical space, a physical office, but they themselves admit that they had a mission in Miami. Okay, that's number one. Let's go to number two. That one doesn't . . . Yep, number two. What are you saying out of your evidence that you showed that she didn't acknowledge? Right. Okay, number two, that Mr. Gary left IMI in 1995. In fact, the record evidence demonstrates that Mr. Gary continued to act as IMI's regional manager for Latin America throughout the . . . Was he paid to do that? Was he paid to do that, or was he just a consultant? I don't know whether . . . I don't know what the payment conventions were. What I do know, Your Honor, is that he represented himself during that period of time as IMI's regional manager for Latin America to customers in Latin America. And, IMI also, in its own documents, recognized him during that time period as its regional delegate for Latin America. That was specifically to the Bolivian government. So, there's evidence to show that Mr. Gary continued to be employed by IMI after 1995. Third, in the late 1990s, the court said . . . Did Mr. Gary file an affidavit or do anything, or is this . . . He did. He did. He filed an affidavit. We also took his deposition, so there's deposition . . . Okay, okay. . . . testimony in the record, Your Honor. Third, that Mr. Gary was engaged as a consultant for IMI in the late 1990s. Mr. Gary himself bristled at that characterization. He said, I'm not only a consultant. I wasn't only a consultant. I don't know what he was doing with that in the deposition. That's so ambiguous. In another part, he's very clear that when he moved from Bogota, where he was IMI's regional manager for Latin America, to Miami, at the time period where they say . . . during the time period they say he became a consultant, his duties hadn't changed. He was still acting as IMI's regional manager for Latin America. So I think we have more than just that ambiguous statement about the fact that I wasn't just a consultant. He recognized that substantively, he did more than just a consultant. I realize that I'm over time, Your Honor, but I . . . That's fine. You only got to number three. Number three. Number four, that meetings between Mr. Osboon and Mr. Gary in Miami were for personal reasons or in connection with Mr. Osboon's other businesses. The court relied for that on the statement of Mr. Gary. The court did not mention, and I believe did not look at, the statement of Mr. Osboon, which says exactly the opposite. That he met with Mr. Gary here . . . But there's a conflict in the evidence, so the court can make a fact finding. Correct. But under Vermeulen, Your Honor, which is an opinion out of this court, of course, when the district court has not conducted an evidentiary hearing and the evidence presented by the parties . . . Okay, are you appealing the failure to have an evidentiary hearing here? No, Your Honor. Okay. What we are appealing is that when no evidentiary hearing is conducted, the court must construe . . . I'm sorry, when no evidentiary hearing is conducted and there's a conflict in the evidence, the court must construe all reasonable inferences in favor of the plaintiff. You know, that's kind of . . . That may be the rule and that may not be the rule, depending upon how far Vermeulen controls. But, I have a problem in that . . . Okay, if you don't ask for the hearing, the judge is just going to decide on . . . And, she's going to decide on what you have. And, she has to make her factual findings. If somebody doesn't tell her you have to have a hearing because of all reasonable inferences must be drawn in our favor . . . And, now I want an evidentiary hearing and I want to bring in these witnesses, then what's the judge supposed to do? And, it's a difficult situation, Your Honor. I agree. At the time that this was argued, at the time the renewed motion to dismiss was submitted and we responded . . . We believe that the record accurately represented our position with regard to the facts. And, the judge didn't buy it. And so, that's why I'm saying your main argument is, she didn't pay attention to anything we said. We didn't get a fair weighing. She didn't pay us . . . And, there's no indication in the orders themselves, that she actually weighed the contradictory facts. Do you want to go finish number 5, 6, 7? Not really. Okay. Can I ask . . . No, I want to ask a legal question. Okay, go ahead. I'm a bit confused about Graviman. What is the Graviman? Okay. It's mentioned in the Supreme Court. They explained it pretty well in a tort case. Yes. I'm not sure what, for a contracts case, a Graviman is. It's an excellent question. Certainly, our position, as I mentioned in the beginning of the presentation, is that the Graviman here is the withdrawal of support from Mr. Osborne in Bolivia, which caused him to have to defend at great personal expense, for which he was never reimbursed. The Graviman of your case, even though the negotiations and the contract performance were basically in Bolivia, the injury to you was the withdrawal of support. That was the Graviman, and that happened from Miami. That is our position. How do you fit that into the Supreme Court's statement that all the elements have to be from the United States? It's a little hard with torts versus contracts. That's correct, and there seems to be a little bit of tension there in the way that I read the Supreme Court's opinion, in that they were very clearly backing away from an examination of the elements standard and instead saying we need to look at where the foundation of the Graviman of this case is. But then they include this language to say all of the elements, and I think ultimately that's what – there's a tension there. I think Graviman really shouldn't have to do with the elements. It's really about where the center – where the damage lies, where the boy's fingers are pinched, I suppose, is a – Okay. Where did your client live throughout all of this? In Bolivia, Your Honor. Okay. Yes. Thank you, Your Honor. Okay. Ms. Varela? Yes. Good morning, Your Honor. May it please the Court, Stephanie Varela from Greenberg Torg, representing Israel Military Industries Limited, and with me at Council's table is Elliot Pedrosa, also from Greenberg Torg. Judge Rustani, picking up on where you left off on what the Graviman of the suit is and what the Court meant by that, essentially where we begin in an FSIA analysis and a sovereign immunities analysis is that an action is based upon the particular conduct that constitutes the Graviman of the suit. In other words, what is the core of the suit? And if you look at the allegations pled by Mr. Esboon, as well as the evidence adduced during discovery, all of that, as Judge Dubina noted, occurred in Bolivia and Israel. No contracts were signed in Miami. No damages arose in Miami. Everything occurred abroad.  Counsel for Mr. Esboon suggested that Jerry provided support from Miami to him through IMI. But that's not what the allegations claim, and that's not what the evidence showed. In fact, what the evidence shows is that Jerry had no binding authority in Miami to do anything. And so all the negotiations, all the decision-making on behalf of IMI, all the contracts that were signed and executed and negotiated occurred in Israel. The core of the suit here, which is that he is seeking reimbursement for the assistance that he provided, allegedly in the Galil proceedings, occurred in Bolivia. And, in fact, any promises that were made according to the complaint, those promises were made when he visited Israel. So even the only thing that Mr. Esboon had pointed to previously in connecting Miami or the United States to him or to IMI is the fact that, as we all know, is that there were six meetings over a 20-year period. We don't know what those meetings were about. We don't know when those meetings were held. What we do know from the record is that the meetings were not held for the sole purpose or the so-called meetings were not held for the sole purpose of having discussions on IMI dealings. They were purely incidental. He had meetings in Miami, and he's in Miami. There's no evidence that over 20 years they communicated about these contracts? There is no concrete evidence. All we know is that there were meetings. We don't know what those meetings exactly discussed. You said concrete evidence. I wanted to know. Twenty years, he's working in Bolivia, and supposedly he's doing something with Mr. Jerry there. There's no evidence of any telephone communications, any e-mails, any discussions between the two of them over 20 years except for the six meetings? Right. The e-mail communication was mostly, as the record will show, was mostly involving IMI in Bolivia, Bolivia and Mr. Esboon, IMI internally, but regardless of those discussions in Miami, which Mr. Jerry testifies that. You're not talking about the six business-slash-work meetings. The six conversations that I think were incidental in Miami were, and Mr. Esboon actually testifies that he, for instance, would travel to Miami and route elsewhere, to Israel, for example, and, yes, he would dine with Mr. Jerry, and they had a very good friendship, according to Mr. Jerry. It was 20 years. I believe I'm quoting correctly. Mr. Jerry said they had a very special relationship, and so they talked about everything. They talked about family. They talked about work, as most of us do, but nothing of legal import occurred in Miami because all the authority, and Mr. Esboon knows this, all the authority comes from Israel, not from Miami, and if I can direct your attention very, very briefly to some of the testimony. The allegations that Mr. Esboon makes are that he was hired to represent IMI's interest in the sales and IMI's products to the Bolivian government. The proposals for Esboon's representation of IMI passed through Bolivia and the office in Colombia, and Colombia is where, in fact, the relationship between Mr. Jerry and Mr. Esboon began. The investigation began in 99, and that is when he was working for IMI, and he was supposedly helping out with the investigation, and then in 2002, he was helping put together the presentation for IMI for the maintenance center project to the Bolivian government, which Bolivia ultimately accepted, and then in 2007, he went to Israel to meet with IMI officials to discuss purportedly his payment plan, but the other point that I want to make that's very important, and this is something that, Judge Christina, I think you mentioned earlier, is that there is no factual dispute in the record. Everything that Mr. Esboon points out in the briefing below is fully supported and can be reconciled, so, for example, I think one of the things that we had talked about was... I said that the district court resolved some factual disputes. I mean, they're saying Mr. Jerry was their regional representative for Bolivia and all of Latin America operating out of Miami, and that he was overseeing these contracts and giving Mr. Esboon support, and you say, no, he was a consultant, but he wasn't allowed to do anything on these contracts, so I think there is conflicting evidence in the record. I just think the district judge may have resolved it. I don't know if she resolved it properly, but it looks like she attempted to resolve it. I apologize for misspeaking. Let me step back, if that's okay. First, when you are challenging subject matter jurisdiction, the court is not constrained to accept the truthfulness of the allegations in the complaint or to draw any inferences in favor of the non-movement. Well, if Fair Moulin applies, yes, and you have to draw inferences in favor of the party seeking jurisdiction unless, and then it has to go back for an evidentiary hearing. I just don't know that that applies when nobody asked for one. That's true, and actually in Vermillion, that comes up in the personal jurisdiction context. Isn't SIA covering both personal and... Sure, sure. That's why I'm a little confused as to whether you apply it. What I think is important here, Your Honor, is that, respectfully, the purported conflicts in the evidence are really just legal conclusions that Mr. Asboon draws, but that are not factually supported by the record. For example, the easiest one, I think, is IMI has an office in Miami. Okay, that is a legal assertion that he makes. What the evidence shows is that, in fact, the location that is identified in the allegations, in the complaint, belongs to a corporate office owned by Mr. Jerry. It has nothing to do with IMI. There is no office presence in Miami or in the United States, and that's also supported by the declarations of Reuven Wolf, who is the head of the IMI legal department, by Mr. Jerry and his declaration as well, and by Mr. Maurer. There is no evidence. That's just one example. Let's assume they don't have a physical office, and he works out of his home, and he works, and he says, I'm the regional representative operating out of Miami, and I worked on all of this. He didn't say that. He did work for IMI. The services that he provided were in Latin America and in Israel, and the majority of the work that he was doing, as it was pointed out earlier, was done abroad. Does Mr. Jerry admit that he traveled all the time to Israel and to Bogota? His testimony was that he slept in Miami. Yes, he would travel to Latin America, which was where the services that he provided, and to Israel. He would travel for weeks at a time, and he would just come home and sleep. Like most of us, yes, he would take work home with him, but the services that he provided were also . . . Let me ask you about who he was actually working for. I thought I saw a reference that IMI had services USA. Yes, there is. And that he was actually an employee. I was going to ask this on a rebuttal. The district court says he's not the employee of IMI, who is the defendant here. He's the employee of an affiliate, IMI Services USA. For a period of time during a 20-year relationship. Beginning in 1995. Yes, correct. I think it was between 1995 and 1998, 1999. It's not entirely clear. He worked for IMI Services USA, which is a separate and distinct legal entity. Nothing at all was alleged to have occurred with respect to IMI USA. IMI USA has nothing to do with it. But, you know, the important thing here to keep in mind, too, is that no negotiations, no promises, no contracts. Nothing occurred in Miami. At most, you have these meetings that occurred that were not solely held for that purpose. It wasn't as if, let's set a meeting, let's discuss this, why don't you come down to Miami and we can meet. That never happened. And his best evidence, by the way, is the affidavit that he produced after the deposition was taken. And the affidavit doesn't make any claims to the contrary. In fact, there's no discussion of any negotiations, any contracts signed, nothing with respect to Miami. He actually corroborates the notion that the meetings were incidental because he says, I flew in twice to Miami to then head out to Israel, which is what Jerry says. So, you know, he never says to the contrary. In other words, there's no argument or allegation to that. And by his own admission, I mean the contracts that were signed, the reason why he's claiming relief is because of things that transpired in Bolivia and Israel. Nothing happened here. No injuries arose here. No damages. And in fact, he actually alleges that the injuries that he had, it's one of the allegations, occurred in Bolivia. Did he bring suit in Bolivia? That was something that was not argued. There was no evidence produced to address that issue. Our position is that we have a forum selection clause that's mandatory. It's presumptively valid. The district court didn't reach that. And the district court also didn't reach your argument on the doctrine of forum non-conveying. That's correct. Which, in my view, would be an alternative way we could affirm the judgment in this case. Absolutely. Thank you, Your Honor. There are other bases. I missed that. Where is the forum in the contract? In the contract, it's in Israel. So Israeli law governs. So you do have a contract with Mr. Plaintiff here? Yes. There is a 98 and 2,000 representative agreement, which, by the way, the complaint actually invokes. Okay, and it says litigation between the parties that should be in Israel. The forum selection clause says, yes, Israeli law governs and all courts comply. The statute of limitations ran in Israel. We said that we reserved our right to raise that as a defense. Mr. Esboon provided no evidence to suggest that Israel would be an inadequate forum because of the statute of limitations defense. He never recounted that. But does it say Israeli law or does it say Israeli law in Israeli courts? Let me quote for you exactly what it says, Your Honor. It says, the agreement shall be governed by the laws of the State of Israel, excluding its conflict of laws rules. The competent courts in Israel shall have exclusive jurisdiction in all matters concerning the agreement. And so just to kind of wrap up this thought, I still have a little bit of time. So ALO and IMI had an agreement between 1998 and roughly 2004. Now, one thing that he did mention below, and I just want to make sure we're on the same page here, is that Mr. Esboon testified that ALO and himself are the same thing. So he operates through ALO, and there's testimony to that point. So as you were saying, Judge Dabena, there are alternative bases to warrant dismissal here. And unless the court has any other questions, I would ask that you respectfully affirm the decisions below. Okay. Thank you, Ms. Varela. Thank you. Now we'll hear from Mr. O'Connor. And you reserved two, sir. I did. Thank you, Your Honors. To address the two alternative bases that were raised, the contracts that IMI has put forth are very limited in their application. They're specifically limited in their term. And none of these written contracts, in fact, govern the time periods when first the Galil contract was negotiated and obtained by Mr. Esboon or when he was negotiating the maintenance center project, which is really all of these. Did he have a contract for that? He did not. He didn't have a contract. On the basis of an oral agreement between them. So the written contracts do not apply in this case. With regards to forum nonconvenience, yes? The reimbursement is because of a pattern of behavior that he had expenses and they reimbursed him. That is correct. Aside from the simple matter of fairness in that he was defending them at his own personal expense. But, yes, you're correct, Your Honor. Now you're saying he didn't even have a contract with them. He had just an oral agreement during the period of time. Their relationship was a series of oral agreements and written agreements. The time periods that are relevant to our claims, they were operating under oral agreements, Your Honor. Where were those oral agreements made? I believe it wouldn't have been Miami, if that's your question. It wouldn't have been Miami. With regard to forum nonconvenience, I think Your Honors recognize that, yes, the statute of limitations has run in Israel and they've indicated that in some of their papers. Moreover, if you'll remember, the basis of this case is that the government of Israel refused to participate in the investigative proceedings of the Republic of Bolivia. If the government of Israel is unwilling to even recognize and participate with the Republic of Bolivia, it's our view that Mr. Osborne is not very likely to get a fair hearing from the government of Israel on this particular matter. Your time has expired, and I think we understand the issues in the case. Thank you for your counsel on both sides. We appreciate your help, and the case is submitted.